UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Case No.: 1:09-CR-11 |
| | ) | |
| JUSTIN FRANKLIN | ) | |

## MEMORANDUM OF OPINION AND ORDER

This matter is before the court for resolution of the Motion to Suppress filed by the defendant, Justin Franklin ("Franklin") on March 5, 2009. Docket at 15. The court held an evidentiary hearing on the motion on April 2, 2009. *See* docket at 21. The parties then submitted further briefing on the issues raised by the motion and this briefing was completed on June 3, 2009.¹ For the reasons discussed herein, the motion to suppress is DENIED.

## FACTUAL BACKGROUND

Franklin was charged by way of an indictment filed on January 28, 2009 (docket at 1), in which he was charged with three offenses. Count 1 charges him with possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1). Count 2 charges him with carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924©. Count 3 charges him with possession of a firearm by a person convicted of a misdemeanor crime in violation of 18 U.S.C. § 922(g)(9). *Id*. Franklin pleaded not guilty to the charges at his arraignment held on February 3, 2009. Docket at 9.

---

¹ The United States of America (the "Government") filed a response in opposition to Franklin's motion to suppress on May 18, 2009 ("Government's Response"). Docket at 24. Franklin filed a brief in support of the motion on that same date ("Defendant's Memorandum"). Docket at 25. The government filed a reply brief on June 2, 2009 ("Government's Reply"). Docket at 26. Finally, Franklin filed his reply brief on June 3, 2009 ("Defendant's Reply"). Docket at 29.

The charges were the result of Franklin's arrest by Fort Wayne Police on December 30, 2008. Motion to Suppress, p. 1. At approximately 9:00 p.m. on that date Franklin was pulled over by Fort Wayne Police detectives Gerardot and Deshaies for allegedly failing to stop at a stop sign at the intersection of High Street and St. Mary's Street. After stopping Franklin, police discovered marijuana and a handgun in the 2001 Chevrolet Impala he was driving and Franklin was arrested. *Id.*, p. 2. Franklin claims in his motion to suppress that the search of his vehicle "was performed without probable cause that Franklin was transporting contraband items." *Id*. Franklin moves the court to "find that Franklin's arrest was pursuant to the illegal search and seizure and was itself illegal; that the court find that the drugs and the weapon allegedly found in the vehicle Franklin was driving, and any statements made by Franklin after his arrest be suppressed and excluded from use by the Government during the trial of this matter." *Id*., pp. 3-4. The government contends that police had probable cause to stop Franklin and that the evidence ultimately seized from the vehicle was discovered because it was in plain view when officers looked into Franklin's car. Government's Response, p. 1.

On the night Franklin was arrested, Fort Wayne Police officers "were conducting surveillance on a house believed to be involved in drug trafficking. Surveillance watched the home's occupants drive about a block away from the house, observed the Defendant's vehicle pull up next to that car, and then watched a brief meeting indicative of a drug transaction between these individuals, with the Defendant's car leaving the brief meeting at a high rate of speed." *Id*. (citing Transcript of Suppression Hearing, pp. 8-9, 46-47, and 69-70).[2] Detective

---

[2] Citations to the transcript of the evidentiary hearing will appear in this Order as "Tr., p. __."

Deshaies tried to follow Franklin's vehicle "in order to run the license plate and gather information about the vehicle or occupant[.]" and while doing so he "observed the car commit an Indiana traffic infraction by running through a stop sign, with the driver failing to come to a stop and instead just slowing down briefly." *Id*., pp. 1-2 (citing Tr., pp. 10, 33-34, and Government's Exhibit 6).[3]

Both Detective Deshaies and Detective Gerardot testified at the suppression hearing. Deshaies testified that when he tried to follow Franklin's car he was unable to catch up to him immediately because Franklin was driving "away so fast that I had trouble catching up to him." Tr., p. 9. Deshaies then radioed to Gerardot, whom he knew was nearby, and at that point saw Franklin "run through a stop sign at an intersection." *Id*., pp. 9-10. Soon after, Deshaies initiated a traffic stop. *Id*., p. 10. At one point during his attempt to catch up to Franklin, Deshaies testified that he "was doing over close to 60 miles an hour . . ." and estimated Franklin's speed "at approximately maybe 40 plus miles an hour, and the speed limit in the area was 30." *Id*. When Deshaies pulled Franklin over, Franklin appeared to stop his vehicle, but then Deshaies observed Franklin's car move forward again. *Id*., p. 13. Deshaies believed Franklin was going to attempt to flee. *Id*. At that point, Gerardot arrived at the scene and pulled up next to Franklin's vehicle. *Id*. Franklin's car then came to a complete stop and Deshaies's patrol car headlights shined directly onto Franklin's vehicle. *Id*. He had an unobstructed view into Franklin's car and could see that it was occupied by only one person. *Id*. Deshaies observed Franklin "make a lot of movement in the car. That was not typical and, under my

---

[3] Government's Exhibit 6, admitted during the evidentiary hearing, is the citation issued to Franklin charging him with disregarding a stop sign.

3

experience, is indicative of someone trying to access some item or secret some item." *Id*., p. 14. Deshaies saw Franklin's "shoulder and his front body dip almost completely out of view forward first. And then what alarmed me the most, sir, I saw his entire body move to the right-hand portion of the car, go completely out of view as he leaned all the way over. It appeared to me as if he were possibly reaching for something on the floor underneath the passenger seat." *Id*. Deshaies testified that when Franklin "made those motions, came back up into the view is when the car started to drive off a little bit. I was unsure if he retrieved a weapon. I didn't know what his intentions were at that point, sir." *Id*., p. 15. Detectives Deshaies and Gerardot exited their patrol cars and Deshaies immediately told Gerardot that he had seen a lot of movement from inside Franklin's vehicle. *Id*., p. 16. The officers were asking Franklin to show his hands through his driver's window. *Id*. Deshaies stated that "every time we would ask him to complete a command–we asked him to show his hands. His hands would disappear completely out of view. Never felt comfortable or safe enough to walk to the vehicle all the way to [the] driver's door, speak with him since he couldn't comply with my simple command of keeping his hands in view." *Id*.

During the evidentiary hearing, the government played portions of the videotape taken from Deshaies's patrol car, which confirmed that Franklin was not strictly following the commands of the officers to place his hands outside his car window. *Id*., p. 18; Government's Exhibit 1 (DVD from in-dash camera).[4] As a result of Franklin's failure to place his hands

---

[4] The court viewed the videotape in its entirety after the evidentiary hearing. While all of the movements and events described by Deshaies are not completely obvious in the videotape (even Deshaies conceded during his testimony that some of Franklin's alleged movements while inside his car can only be seen "[v]ery faintly."), the tape does confirmed most of Deshaies's testimony about the unfolding of events during the traffic stop. For example, Franklin's car can

4

outside his window and keep them visible, Deshaies drew his service weapon as he approached Franklin's car. Tr., p. 19. At that point, "all of a sudden [Franklin] opens the door to come out of the car. He had his hand out of the vehicle. I had absolutely no idea why he was not listening to us." *Id*. Once Franklin exited his vehicle, Deshaies and Gerardot "order[ed] him to the ground. [Franklin] tries to access–looked like he was trying to access his pocket at that point. We were so concerned that he might have a weapon. We were so close to him. We couldn't afford any more time using verbal skills. We had to move in and actually put hands on him to actually restrain his movement." *Id*., p. 20. Both officers then holstered their weapons and eventually restrained Franklin and placed him in handcuffs. *Id*., pp. 20-21. However, Franklin physically resisted Deshaies's attempts to subdue him at first, forcing Deshaies to take Franklin to the ground in order to place him in handcuffs. *Id*., p. 23. Once Franklin was subdued and handcuffed, Det. Gerardot walked around Franklin's car looking into the windows and told Deshaies that he could see marijuana on the floor of the car. *Id*., p. 26. Moments later, Deshaies took photographs of the inside of Franklin's vehicle, which show what appears to be a large bag of marijuana and the handle of a handgun protruding from under a seat. Government's Exhibits 2 and 3. The marijuana was visible from underneath the driver's seat of Franklin's car (Tr., p. 26; government's Exhibit 2) while the handgun was visible from underneath the passenger seat (Tr., p. 29; government's Exhibit 3).

After Franklin was arrested, Deshaies transported him to the Fort Wayne Police Department. Tr., p. 30. Deshaies testified that during the drive to the police station Franklin

---

be seen moving forward slightly just after he first appeared to pull over; movement can be seen from inside Franklin's car before he exited it; and the slight struggle that occurred as Deshaies attempted to subdue and handcuff Franklin is also observable.

"was very voluntary with his statements. He kept stating that he could take us to the dealer, that he had just left the dealer, he could take us right now. I kept advising him I couldn't speak to him until such time as he had been properly Mirandized. He kept saying he understood that, then he would continue with that we're 'missing it. I can take you right now. He's still there.'" *Id*. Once Franklin was delivered to the police station he was interviewed by police and a videotape of the interview was introduced into evidence at the hearing. Government's Exhibit 5.

Detective Gerardot's testimony corroborated Deshaies's testimony. Gerardot explained that when he came onto the scene of the traffic stop he saw Franklin's car begin to move forward slightly after having appeared to pull over to stop. Tr., pp. 60-61. When Gerardot stopped his car and was able to observe Franklin, he saw that Franklin "was leaning over towards the passenger's side seat. He did this a couple of times. Acting very nervous inside the vehicle. He's making furtive movements more towards like the seat as opposed to like the dash area. He was kind of reaching down. He was moving around a lot even when he was just sitting behind the steering wheel." *Id*., p. 62. Gerardot testified, as did Deshaies, that such movements by an individual who has just been stopped by police arouses officers' suspicion and concern that the driver might be trying to hide something or retrieve something. *Id*. Gerardot confirmed that Franklin was not obeying Deshaies's repeated commands to show the officers his hands and that he continued to move around inside his vehicle. *Id*., p. 63. Gerardot also confirmed that when Franklin began to exit his vehicle, which the detective considered "abnormal behavior," Gerardot pointed his service weapon at Franklin and both officers shined their flashlights on him. *Id*. Gerardot testified that once Franklin was handcuffed, he [Gerardot] looked into Franklin's vehicle thought the driver's window and saw "the front half of a large Ziploc plastic baggy with

6

a green leafy substance, which I was pretty sure was marijuana due to my training and experience, sticking out from underneath the driver's seat. It was in plain view." *Id.*, p. 65. Gerardot opened the driver's door of Franklin's vehicle and, when he looked across the floorboard, could see what "looked like the rear hand guard of a–or the handle part of a handgun, a semi-automatic handgun." *Id.*, p. 66. Gerardot reiterated that he saw the marijuana in plain view when he first looked into Franklin's vehicle from outside the driver's window. *Id.* Gerardot also corroborated Deshaies's testimony that both detectives knew before they pulled Franklin over that he had been observed by other police officers meeting with individuals who had exited the house that was under surveillance for suspected drug trafficking activity. *Id.*, p. 70.[5]

## DISCUSSION

The Fourth Amendment protects citizens from unreasonable searches and seizures of their persons and property. The Fourth Amendment states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Constitution, Fourth Amendment. When a search or seizure is conducted in the absence of a warrant it is considered *per se* unreasonable and a violation of the Fourth Amendment with only a few exceptions. *Katz v. United States*, 389 U.S. 347, 357 (1967). A warrantless search or seizure is does not violate the Fourth Amendment if it occurs incident to a lawful arrest. *Weeks*

---

[5] Deshaies and Gerardot were the only two witnesses presented at the evidentiary hearing.

*v. United States*, 232 U.S. 383, 392 (1914).  In *New York v. Belton*, 453 U.S. 454 (1981) the U.S. Supreme Court held that in the context of an automobile, the passenger compartment may be searched incident to a legal arrest since that specific part of the vehicle is generally within the reach of the arrestee.  In this case, Franklin does not contest Deshaies's assertion that he ran a stop sign, nor does he contest the validity of the traffic stop.  However, during cross-examination, Franklin's attorney asked Det. Deshaies if the act of running a stop sign is "a jailable offense," and Deshaies responded that it is not and that it is considered only a traffic infarction.  Tr., p. 48.  Thus, the officers did not have any probable cause to arrest Franklin simply because he ran a stop sign.  Consequently, they also did not have reason to search Franklin's vehicle as "incident to a legal arrest" since they had no grounds to arrest Franklin for running the stop sign.

As Franklin correctly points out in his brief in support of his motion to suppress, the U.S. Supreme Court recently clarified the circumstances under which police may search an arrestee's vehicle incident to arrest.  In the decision in *Arizona v. Gant*, 2009 WL 1045962 (April 21, 2009),  ___ U.S. ___, 129 S.Ct. 1710, 173 L.Ed.2d 485, the Court held that the rule set forth in *Belton* does *not* authorize a search of an arrestee's car after the driver is legally arrested, if the arrestee already "has been secured and cannot access the interior of the vehicle."  Defendant's Memorandum, pp. 6-7.  In the *Gant* case, Gant was arrested for driving with a suspended license.  He was arrested, handcuffed, and placed into the back of a police patrol car.  The Supreme Court held that since Gant was secured and was unable to access anything in his vehicle, and since the police had no basis for believing that evidence of Gant's crime (i.e., driving with a suspended license) would be found in the passenger compartment of his vehicle, any subsequent search of

the interior of that vehicle violated Gant's Fourth Amendment rights. *Gant*, 2009 WL 1045962 \* 8. The Court wrote that "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains *evidence of the offense of arrest*." *Id*. \* 11 (italics added). Thus, the Court restricted the discretion of police officers to search a person's automobile even in cases where the police have a legitimate reason to arrest the person. That is, the Court placed limits on the "search incident to arrest" exception to warrantless searches of automobiles.

Franklin maintains that the *Gant* decision renders the search of his vehicle invalid since his only offense was running a stop sign and the police would have no valid reason to find evidence of that infraction in the passenger compartment of Franklin's vehicle. Defendant's Memorandum, p. 8. As a result, Franklin argues that the search of his car violated the holding in *Gant*, was therefore violative of Franklin's Fourth Amendment rights, and that the evidence seized should be suppressed. *Id*. Franklin argues that "*Gant* and [the present case] are analogous in that the police did not find the marijuana or the gun until after the search of the car was made while Franklin was secured, handcuffed, and sitting in the back of the police car." *Id*., p. 9.

It is crucial to note, however, the Supreme Court in *Gant* went on to say that a warrantless search of a suspect's vehicle is unreasonable "unless police obtain a warrant *or show that another exception to the warrant requirement applies*." *Id*. (italics added). The Court explained as follows:

> Other established exceptions to the warrant requirement authorize a vehicle
> search under additional circumstances when safety or evidentiary concerns

9

> demand. For instance, *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77
> L.Ed.2d 1201 (1983), permits an officer to search a vehicle's passenger
> compartment when he has reasonable suspicion that an individual, whether or not
> the arrestee, is "dangerous" and might access the vehicle to "gain immediate
> control of weapons." *Id.,* at 1049, 103 S.Ct. 3469 (citing *Terry v. Ohio,* 392 U.S.
> 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). If there is probable cause to believe
> a vehicle contains evidence of criminal activity, *United States v. Ross,* 456 U.S.
> 798, 820-821, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), authorizes a search of any
> area of the vehicle in which the evidence might be found. . . . *Ross* allows
> searches for evidence relevant to offenses other than the offense of arrest, and the
> scope of the search authorized is broader. Finally, there may be still other
> circumstances in which safety or evidentiary interests would justify a search. Cf.
> *Maryland v. Buie,* 494 U.S. 325, 334, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990)
> (holding that, incident to arrest, an officer may conduct a limited protective sweep
> of those areas of a house in which he reasonably suspects a dangerous person may
> be hiding).

*Gant*, 2009 WL 1045962 *9. Thus, what the *Gant* holding did was set parameters on when police can search an arrestee's vehicle when police have no probable cause to believe that evidence of a crime is concealed in that vehicle. What the holding did *not* do is overrule decades of well-established case law regarding various carefully defined exceptions that permit warrantless searches of automobiles under certain circumstances.

In a case decided shortly after *Gant*, the Sixth Circuit addressed the issue of a vehicle search and held that where evidence is in the plain view of police officers, probable cause then exists for a more extensive search of an individual's car. The court explained as follows:

> [Defendant's] refusal to comply with [a] detective's repeated requests to exit the
> car combined with [the detective's] discovery that [defendant's] car was not in
> "park" and that [defendant's] foot was on the brake, justified the officers'
> decision to forcibly remove him from his car for their safety. *See Graham v.
> Connor,* 490 U.S. 386, 396 (1989) ("[T]he right to make an arrest or investigatory
> stop necessarily carries with it the right to use some degree of physical coercion
> or threat thereof to effect it."). When the officers were removing [defendant]
> from the car, the aforementioned clear plastic bag fell to the ground in front of
> [the detective], and he appropriately seized it under the "plain view doctrine."
> *Horton v. California,* 496 U.S. 128, 135 (1990) (explaining that the "plain view

10

doctrine" is an "exception to the general rule that warrantless searches are presumptively unreasonable," which is applied "where a police officer is not searching for evidence against the accused, but nonetheless inadvertently comes across an incriminating object") (citing *Harris v. United States,* 390 U.S. 234 (1968); *Frazier v. Cupp,* 394 U.S. 731 (1969); *Ker v. California,* 374 U.S. 23, 43 (1963)). The question, therefore, is whether the officers were reasonable in effectuating a warrantless seizure based on their plain view of what appeared to be methamphetamine.

*U.S. v. Hunter*, 2009 WL 1491464 *4 (6th Cir. May 28, 2009) (unpublished opinion).

In the present case, two still-valid exceptions to the requirement of a search warrant apply to defeat Franklin's arguments. The *Gant* decision did not alter the well-established rule that if evidence is in "plain view" of officers, even if they don't have probable cause to arrest a driver based on the underlying traffic infraction, that evidence can be seized even without a warrant. *Texas v. Brown*, 460 U.S. 730 (1983); *United States v. Rivera*, 825 F.2d 152 (7th Cir. 1987). The government also argues that the so-called "automobile exception" applies in this case and provides that "an officer may search a vehicle without a warrant when there is probable cause to believe that the search will uncover contraband or other evidence of crime." Government's Reply, p. 2 (citing *United States v. Hines*, 449 F.3d 808, 814 (7th Cir. 2006) and *United States v. Seymour*, 519 F.3d 700, 713-14 (7th Cir. 2008) (upholding search of vehicle where officer observed a gun in plain view on the passenger seat). The government argues that "[t]he automobile exception applies if police had probable cause to believe that [Franklin's] car contained marijuana or other contraband, and Detective Gerardot's observing marijuana in plain view furnished probable cause to seize the marijuana and other evidence from the car." *Id*.

Franklin does not contest this argument by the government directly. Instead, he argues that the marijuana Gerardot observed was not actually in "plain view" and points to certain

specific portions of the record to support this argument. For example, Franklin states that "Gerardot did not see the marijuana until the door [to Franklin's vehicle] was open; it was Gerardot who opened it." Defendant's Reply, p. 2. Franklin also claims that the videotape of the traffic stop (Government's Exhibit 1) "shows that Gerardot looked into the window . . . and had no reaction whatsoever. In fact, he continued to walk around the vehicle." *Id*., p. 3. Franklin also states that Det. Deshaies, during his testimony, recalled that Det. Gerardot "began to conduct–he began to walk the perimeter of the vehicle and **opened the driver's door**. And he immediately saw what he believed to be marijuana . . ." *Id*., citing Tr., p. 24 (emphasis in original). On the other hand, the following exchange also took place during Deshaies's testimony at the hearing:

> THE COURT: I think I sort of spoke over you. You said Gerardot discovered marijuana in the car as he circled around, looked inside the car?
>
> DESHAIES: Yes, sir. I can't advise exactly at what point. He stated there's a bag of marijuana. He could see it in plain view.

Tr., p. 25. Franklin also argues that Gerardot's own testimony contradicts his assertion that he immediately recognized that the plastic bag under Franklin's seat contained marijuana. Franklin points out that Gerardot testified at one point that he was "pretty sure" the bag contained marijuana (Tr., p. 65), then later testified that when he actually stuck his head inside the vehicle he "immediately recognized" that it was a bag of marijuana (Tr., p. 66). According to Franklin, this establishes that Gerardot never saw the marijuana until he opened the door to Franklin's car and looked inside, which Franklin portrays as an illegal, warrantless search.

The government responds to this argument by pointing out that absolute certainty on the part of police that an item is contraband is not necessary to establish probable cause. The

government argues that the Supreme Court, in *Texas v. Brown*, explained that a "'high degree of certainty as to the incriminatory character of evidence is [not] necessary for an application of the plain view doctrine.'" Government's Reply, pp. 2-3 (quoting *Brown*, 460 U.S. at 741). The government argues that "[t]he Supreme Court reaffirmed that probable cause was the standard, not 'that the officer must be possessed of near certainty as to the seizable nature of the items.'" *Id*., p. 3 (quoting *Brown* at 741-42). The government argues that "[a]s has been stated in many cases, probable cause is a flexible, common-sense standard that merely requires that the facts available to the officer would warrant a person of reasonable caution in the belief that contraband may be present." *Id*. Finally, the government points out that "[a] seizing officer may also rely upon the statements of other officers who are aware of facts, with such knowledge imputed to the seizing officer under the collective knowledge doctrine." *Id*. (citations omitted). In the present case, the government argues, "[g]iven Detective Gerardot's extensive training and experience and the nexus between drugs and guns, he had ample probable cause to retrieve the marijuana from the Defendant's car and search the car for evidence of that offense, especially considering the Defendant's movements being consistent with hiding items in multiple places within the car and the prior suspected drug transaction." *Id*. The government's arguments are compelling, especially given the totality of the circumstances in this case. It is undisputed in the record that police officers conducting surveillance on a residence suspected of being involved in drug trafficking observed Franklin's vehicle meeting very briefly with individuals who left that residence. Deshaies, listening to broadcasts from that surveillance activity on a secure police radio, observes Franklin's car driving through the area at a high rate of speed. Franklin does not dispute that Deshaies had a valid reason for initiating a traffic stop once Franklin ran a stop sign.

Then, and most importantly, Franklin's suspicious movements after he is pulled over and his repeated refusal to comply with Deshaies's reasonable commands, quite understandably caused both Deshaies and Gerardot to be not only suspicious of Franklin's activities, but very concerned for their own safety. In addition, Franklin was not completely compliant when Deshaies tried to place him in handcuffs.[6]

But what really turns the tide in this case is Gerardot's own testimony about seeing the marijuana in plain view. Notwithstanding Franklin's attempts to characterize Gerardot's testimony as contradictory and/or inconclusive on this issue, the court found that testimony to be clear and convincing. Again, Gerardot testified as follows:

> Q. Does there come a point in time when you look in the car?
>
> A. Yes, sir, after he is put into handcuffs and secured by Detective Deshaies, I look in the vehicle through the driver's side window. And underneath the driver's seat, I can see the front half of a large Ziploc plastic baggy with a green leafy substance, which I was pretty sure was marijuana due to my training and experience, sticking out from underneath the driver's seat. It was in plain view.
>
> Q. Was the door open at this time?
>
> A. I think when I first looked in th door was closed. I looked in through the driver's window.

*Id.* Franklin does not contend (nor could any defendant reasonably contend) that Gerardot's act

---

[6] The government does not argue that Franklin could have been arrested for resisting the officers' attempts to subdue and secure him, nor was any testimony on that point elicited during the hearing. However, Gerardot did testify, when asked if Franklin was compliant during the handcuffing process, that "he continued to struggle and squirm around. We forcefully put him in handcuffs and then he continued–at that point he started talking about taking us to where he bought narcotics. He could take us to some people. He repeated that several times as we were handcuffing him." Tr., p. 65. Obviously, the officers could have reasonably interpreted this as an admission by Franklin that he was actively involved in the commission of a crime, which would afford probable cause for his arrest.

14

of looking into the car from outside could be construed as a search in violation of the Fourth Amendment. The court found Det. Gerardot's testimony to be clear, unambiguous, and–most importantly–credible. Gerardot testified that he looked through the driver's window of Franklin's car and saw a large bag sticking out from under the driver's seat that, based on Gerardot's training and experienced, contained marijuana. The photographic evidence introduced at the hearing corroborates this version of events. Even Franklin's own actions of moving about inside his car when he was pulled over provide strong, albeit circumstantial, evidence corroborating the officers' belief that he was attempting to retrieve and/or conceal something inside the passenger compartment. Therefore, the court concludes that the marijuana was in plain view when Gerardot saw it, at which time the officers had probable cause to arrest Franklin and to conduct a search of his vehicle incident to arrest.[7]

## CONCLUSION

For the reasons discussed in this Opinion and Order, the Motion to Suppress filed by the defendant, Justin Franklin, is DENIED.

Dated: July 6, 2009.

---

[7] Based on the evidence presented, the court reaches the same conclusion with respect to the handgun found in Franklin's car. That is, that it was in plain view and that the testimony elicited from Deshaies and Gerardot established that the handgun was sticking out from under the passenger seat of Franklin's vehicle. Also, even though neither party discusses it in their briefs, it is likely that the "inevitable discovery" exception to warrantless searches would have applied in this case with respect to the handgun. That is, once Gerardot saw the large bag of marijuana in plain view in Franklin's car and had probable cause to arrest Franklin, a subsequent inventory search of Franklin's vehicle would most certainly have resulted in the discovery of the handgun. Therefore, even assuming for the sake of argument that the gun was not in "plain view," its subsequent discovery and seizure was very likely inevitable. But given the evidence in this case, the court need not rely on the inevitable discovery doctrine to justify the actions of the officers, the arrest of Franklin, or the seizure of the marijuana and handgun.

15

/s/   William C. Lee
William C. Lee, Judge
United States District Court
Northern District of Indiana